JOHN ARRINGTON, *Appellant,* V. A. M. HORNER,
*Appellee.*

No. 17,975.

SYLLABUS BY THE COURT.

1. AUTOMOBILE—*Statutory Regulation of Speed and Operation
on Rural Highway.* The driver of an automobile on a rural
highway shall not operate his automobile at a greater speed
than is reasonable or proper, having due regard for the
traffic and use of the highway, or so as to endanger the life
or limb of any person, or in excess of twenty miles per hour.
(Gen. Stat. 1909, §§ 450, 451.)

2. ——— *Same.* When approaching persons driving or riding
domestic animals an automobile driver shall, if such animals
appear restive and frightened, reduce speed, if practicable
turn to the right and give the road, and upon signal from
the rider or driver, proceed no further toward such animal or
animals, but remain stationary long enough for them to pass.
(Gen. Stat. 1909, § 452.)

3. ——— *Same.* In other respects the driver of an automobile
shall, when meeting or passing persons driving or riding do-
mestic animals, exercise the care and caution to prevent in-
jury and insure safety which a reasonably prudent person
would exercise, taking into consideration all the elements of
the situation, including the appearance and attributes of his
peculiar kind of vehicle. (Gen. Stat. 1909, § 452.)

4. ——— *Duties of Persons Driving Domestic Animals.* A
corresponding duty rests upon a person riding or driving
domestic animals when approached by an automobile to take
cognizance of the conditions and to exercise the care and
caution which a reasonably prudent person would display in
their presence.

5. ——— *Duties of Drivers of Automobiles and Domestic Ani-
mals to Look Ahead—Approach from Behind.* It is the duty
of a driver on the public highway, whether of an automobile
or of domestic animals, to look ahead and see whatever there
may be in the line of his vision which should affect his driving,
and if the driver of a team knows that an automobile is ap-
proaching from the rear, to act with reasonable prudence in
the light of such knowledge.

52—88 KAN.

Appeal from Kingman district court. Opinion filed February 8, 1913. Affirmed.

*A. L. Noble,* of Winfield, and *John McKenna,* of Kingman, for the appellant.

*Charles C. Calkin,* and *S. S. Alexander,* both of Kingman, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action in the district court was commenced by Arrington to recover the value of a horse which he owned and which was injured in a collision with an automobile driven by Horner. The jury returned special findings and a general verdict favorable to the defendant. Judgment was rendered accordingly and the plaintiff appeals.

James Harper was driving a team of mules hitched to a loaded wagon, eastward on a public highway. The horse which was injured was a saddle horse and was tied with two or two and one-half feet of rein to the back band of the right-hand mule of Harper's team. Behind Harper, Edgar Benson was driving a team of four mules hitched abreast to a loaded wagon. The defendant approached the two teams from the west. He turned to the right and when passing the led horse it suddenly swung out in front of the automobile which struck the horse's right hind leg and inflicted an incurable injury. Details of the incident are disclosed in the following special findings of fact:

"3. When did the horse that was being led at the side of the team of mules first show signs of fright? Answer. When automobile was opposite the wagon.

"5. Would the horse have been injured in the manner in which it was injured if said horse had not turned crosswise in the road? Answer. No.

"6. Could the said A. M. Horner, in charge of said automobile have done anything to have prevented the injury after said horse first showed fright and turned across the road? Answer. No.

"8. What was the distance in feet between the north wheel of the automobile and the south wheel of the wagon at the point where the injury occurred? Answer. Eight or nine feet.

"9. Did the driver of the front wagon, drawn by the team of mules, as the automobile approached, begin to turn to the north? Answer. No.

"10. Could the said driver of the front team of mules have turned said team further to the north and driven said team and wagon further to the left at the point where said automobile was passing? Answer. Yes.

"11. What was the condition of the highway on the north side of the road at the point where said automobile was about to pass said team and wagon? Answer. Smooth.

"12. Did the said Harper see and know that said automobile was approaching? Answer. Yes.

"13. How far behind said wagon in which said Harper was riding was the said automobile when the said Harper first saw the same and knew it was approaching? Answer. Forty or fifty yards.

"14. Was there a bank or rise on the south side of the beaten track up which the automobile had to go in turning to the right, and at the point where the automobile was opposite the said horse that was injured? Answer. Yes.

"15. State the distance from the said bank or rise on the south side of the road to the north wheel of the automobile at the point where the automobile was opposite the said horse. Answer. About two feet.

"16. What was the condition of the highway, as to being smooth or rough on the south side of the highway, and where said automobile was traveling? Answer. It was rough.

"17. Was there anything to prevent the said Harper from turning to the north and thus placing more distance between the said team and saddle horse and the said automobile at the point of passing? Answer. No.

"19. For what distance could the said Harper see and know that said automobile was appoaching the said team and wagon controlled by him? Answer. About 80 rods.

"20. As Horner approached in the automobile did

the rear four-horse team incline or turn to the north? Answer. He did."

These findings cover all the material facts in the case except the rate of speed at which the defendant was driving. They show affirmatively that the defendant was not guilty of any negligence, leaving out of account the rate of speed. The testimony was that he was driving at a rate variously estimated at from six or eight to fifteen miles per hour. The statute provides that the driver of an automobile shall not operate it on a rural highway at a speed greater than is reasonable and proper, having due regard for the traffic and use of the highway, or so as to endanger the life or limb of any person, or in excess of twenty miles per hour. (Gen. Stat. 1909, §§ 450, 451.) Whether or not the speed maintained by the defendant was unreasonable or improper under the circumstances, and was the proximate cause of the injury were, of course, questions for the jury, and presumably were determined in the defendant's favor.

The principal errors assigned relate to instructions given. Section 6 of the act referred to reads as follows:

"Every person having control or charge of a motor vehicle or automobile shall, whenever upon any public street or highway and approaching any vehicle drawn by a horse or horses, or any horse upon which any person is riding or driving domestic animals, operate, manage or control such motor vehicle or automobile in such manner as to exercise every reasonable precaution to prevent the frightening of any such horse or horses or domestic animals, and to insure the safety and protection of any person riding or driving the same; and if such horse or horses or domestic animals appear restive and frightened, the person in control of such motor vehicle shall reduce the speed thereof, and if practicable turn to the right and give the road, and, if requested by signal or otherwise by the driver of such horse or horses or domestic animals, shall proceed no farther towards such animal or animals, but remain

stationary so long as may be necessary to allow such horses or domestic animals to pass. This provision shall apply to automobiles or motor vehicles going either in the same or in the opposite direction." (Gen. Stat. 1909, § 452.)

The effect of the court's instructions to the jury was that under this statute the driver of an automobile must exercise the care and caution of a reasonably prudent person, taking into consideration all the elements of the situation, to prevent fright and to insure safety. This is a correct interpretation of the statute. The jury was also instructed that a like duty rests upon the driver of a horse or team approached and that a failure to act accordingly constitutes contributory negligence. This, too, is a correct statement of the law.

The statute did not make the automobile driver an insurer. "Every reasonable precaution" is merely the precaution which a reasonably prudent man would take in view of the danger to be apprehended. The end to be attained is the end in view in all cases where reasonable precaution is called for, the avoidance of peril and the insurance of safety. Because of the appearance and attributes of a motor driven vehicle there is a manifest difference in the situation presented when one meets or passes a team and when two teams meet or pass. The prudence demanded of the automobile driver is by no means the same as if he, too, were driving a team. He must order his conduct in the light of the conditions created by the presence and operation of his peculiar kind of conveyance, and in doing so must observe every precaution which would occur to a reasonably prudent man occupying his place. When he has done this he has discharged his full duty under the statute, up to the point of obeying the specific injunctions to reduce speed, turn to the right, give the road, and remain stationary, under certain designated conditions. On the other hand, the driver of the

team which is met or passed is likewise confronted with a different situation from the one he would occupy if the automobile were merely a horse drawn vehicle. He, too, must take cognizance of the conditions and act with reference to them.

The court instructed the jury upon the duty to turn to the right when practicable, and stated that the driver of a horse or team approached by an automobile who negligently or carelessly fails to turn to the right, when practicable, is guilty of contributory negligence. It is claimed that the instruction could not be applied to one in Harper's situation since his turning to the right would only have accentuated the danger. This is true and for that reason the jury could not by any possibility have been misled by the instruction. The purpose of the court was doubtless merely to complete an exposition of the correlative duties of drivers of the two kinds of vehicles. It may be observed that the statute makes it imperative for the driver of an automobile to turn to the right only when the team approached shows signs of restiveness and fright, and when practicable. In such cases, if reasonable prudence would suggest that the driver of the team should turn aside, his course would clearly be to the right, if practicable.

The jury was instructed that negligence in hitching the horse in such a way that he could not be handled or controlled would bar recovery. The proof was uncontradicted that the horse was led in the usual and customary manner and since the proof coincided with the common knowledge of the jury on the subject, the instruction affords no basis on which to predicate error.

The jury was instructed that negligence on the part of the defendant must have been the proximate cause of the injury and that the injury was such as could have been anticipated as a result of such negligence. It is claimed that the instruction is open to the interpretation that the defendant would not be negligent

Arrington v. Horner.

unless he should have foreseen the particular injury which occurred.   The interpretation proposed is a forced one since the language of the instruction clearly goes no further than to require that the injury belong to the class of forseeable occurences.

The court instructed generally with reference to the duty of a driver on the public highway to look ahead and see whatever there may be in the line of his vision which should affect his driving.   The instruction was then applied specifically to the defendant and in the same connection it was said that Harper, as the agent of the plaintiff, was bound to take due notice and act accordingly if he knew the defendant was approaching from the rear.   It is argued that the instruction required Harper to have eyes in the back of his head. It is clearly susceptible of no such meaning and in view of special findings numbered 12 and 13, based on Harper's own testimony, was properly given.

The court gave the following instruction:

"In the ordinary walks of life, injury and damage often occur to persons and property, that can not be traced to the fault and neglect of anyone, and so constitute only a mere accident for which no one is responsible, and for which no one can be held liable, and the person or persons suffering loss or damage by mere accident are without remedy and must bear the loss.   So in this case, if you find that in the accident in question, Mr. Horner was guilty of no fault or wrong, and that the injury and damage sustained by Mr. Arrington was a mere accident, then he is without remedy and can not recover in this action, and you should so find."

It is argued that the judgment should be reversed because the court inadvertently designated the occurrence in question as an "accident" instead of an "incident."   It is not likely that the verdict turned upon this distinction.

The instructions are subjected to some further criticism, and the evidence favorable to the plaintiff is

marshaled to show that the verdict is not supported by the evidence. The court is satisfied that substantial justice has been done and the judgment of the district court, is therefore, affirmed.